## Morgan v. Commonwealth.

Jan. 24, 1939.

WILLIAM LEWIS & SON, ROY W. HOUSE and A. T. W. MANNING for appellant.

HUBERT MEREDITH, Attorney General, and J. M. CAMPBELL, Assistant Attorney General, for appellee.

Opinion of the Court by Creal, Commissioner—
Affirming.

Under an indictment charging William I. Morgan, Lilly Morgan and Wesley Morgan with the murder of Garrett Maupin, the former, on separate trial, has been found guilty of voluntary manslaughter and his punishment fixed at imprisonment for 10 years. He is appealing.

As appears from the evidence, Garrett Maupin, a boy about 18 years of age, who lived on or near Morgan branch in Clay county, disappeared on December 18, 1937, or at least he was never seen alive after that date. Appellant, his wife and son who were jointly indicted with him lived on their farm on Morgan branch. When relatives and friends of Garrett Maupin became concerned about his absence it seems that suspicion immediately attached to appellant, his wife and son, who composed the entire family, and officers armed with search warrants searched his buildings and premises three or four times. The final search made on February 7, 1938, resulted in the body of Garrett Maupin being unearthed in a lot containing a fraction of an acre on the farm of appellant and about 200 yards from his home. An autopsy disclosed that he had been shot through the thigh, the bullet passing through an artery, and a physician testified that this would have caused death within a few minutes. There was also evidence of a fracture or crushed place in the back of the skull which would also likely have produced death. There is evidence as to other bruises or contusions on the body. Sometime about 3 or 4 o'clock on the afternoon of December 18, 1937, appellant, his wife and son left their home in a road wagon and went to the home of Henry Allen a mile or so away; they returned about dark or shortly thereafter and were seen and heard by a number of witnesses and neighbors as they returned. Short-

ly after they passed a man ·or boy passed going in the same direction and one Harris and a number of neighbors who gathered at his home a short distance from the home of the Morgans testified that they heard this boy pass, singing and "hollering." A few minutes after he passed they heard a number of shots apparently in the direction of the home of appellant. Nothing further was heard of the person who passed along the road singing. There was some effort on the part of appellant to show that these shots testified to by neighbors were fire cracker explosions, but a number of witnesses testified that they could tell the difference between the explosion of fire crackers and a gun shot and that the reports they heard were gun shots. At the time Maupin disappeared the lot in which his body was later found had not been plowed and some shocks of fodder stood on or near the spot where the body was unearthed. However, before the body was found the lot had been plowed and stable manure scattered around the spot where the body had been buried. The father of deceased testified that after a posse had searched appellant's premises the day before the body was finally found, he secreted himself behind a tree on the mountain side 300 or 400 yards from appellant's residence and in view of the residence and the lot where the body was found; that shortly after the posse had disappeared, appellant, his son and Pearl Sams and another man whom he did not recognize, came from the house, and went to the spot where the body was later unearthed, looked around for a few minutes and then left. It appears that young Maupin did not live with his father but stayed at different places and at the time he disappeared was living with Jack Buckles. Some of the family testified that he left there on the morning of December 18 in an automobile with another boy. He was later seen by a number of people in Burning Springs and some time in the afternoon went in an automobile with some other person to Manchester. A young man who lived near the mouth of Morgan branch and near the paved highway testified that about dark on the afternoon of December 18, he heard an automobile stop and someone alight and start up the Morgan branch road toward the home of appellant; that whoever it was called to him two or three times; that it was the voice of either deceased or another boy whom he named that called; the other boy named by him was called as a wit-

ness and testified that he was not along there that evening.

The officer who arrested appellant and other witnesses who were present at the time testified that when the arrest was made appellant seemed very much perturbed, made some exclamation and said, "It is a sight what a man's boys will get him into." The officer then went and arrested appellant's son and brought him into the house where his father was. In the conversation that followed the son said: "Mr. Howard, it isn't necessary to take dad, don't take dad, I will take it on myself, I'm the one that killed him." One witness testified that appellant stated to him that he stayed at Henry Allen's on the night of December 18. Appellant testified that on their return from Allen's he and his wife went into the house and the son went to the barn to put the team away and immediately returned; that neither he nor his son nor wife fired any shots; that he saw or heard nothing of young Maupin and that none of them killed him or did him any harm; that he knew nothing about him being buried in the lot on his place. He denied in toto the statements of the father of deceased that on the afternoon before the body was found he, his son, and Pearl Sams and another man went to the spot where the body was unearthed. Sams also denied that such thing occurred and attempted by himself and other witnesses to account for his whereabouts at all times that day. Appellant also denied that he or his son made the statements after their arrest which the sheriff and others stated they made or that he made the statement that he stayed at the home of Henry Allen on the night of December 18, but testified that he stated he was there that evening or night.

The evidence shows that there had never been any trouble between deceased and appellant or members of his family and there is no showing of any motive on their part for the killing. A number of witnesses, including officers, testified to the good reputation of appellant for peace, quietude and good citizenship.

It is first argued that the court erred in admitting incompetent evidence over the objection of appellant. The brief on behalf of appellant recites at length the efforts of attorneys for the commonwealth to bring out evidence as to statements made by appellant and his son immediately after their arrest and while being trans-

ported to jail, and also evidence admitted as to statements made by them, and urges that such evidence was incompetent and prejudicial. Counsel cite authorities to the effect that one accused of crime may keep silent when statements are made by another in his presence tending to connect him with the crime and that as a general rule, evidence of such statements and the failure of accused to respond to them is inadmissible; however, we find that this court in many cases has held that in some circumstances such evidence is admissible. See Blanks v. Commonwealth, 223 Ky. 484, 3 S. W. (2d) 1105; Pierson v. Commonwealth, 229 Ky. 584, 17 S. W. (2d) 697; Boreing v. Commonwealth, 211 Ky. 474, 277 S. W. 813. However, counsel admit that no statement was made either by appellant or his son tending to connect appellant with the commission of the crime and this is true. The statement made by appellant tended to indicate that the son was responsible for whatever had been done, and the statement which witnesses testified the son made was an admission of his own guilt and wholly exonerated his father. It is therefore apparent that if any error was committed in the admission of evidence as to statements made by appellant and his son, it was favorable rather than prejudicial to him. A careful consideration of all the objections made concerning the admission of incompetent evidence leads to the conclusion that no prejudicial error was committed in that particular.

As further grounds for reversal it is argued that appellant's motion for a peremptory instruction should have been sustained and that the verdict is flagrantly against the evidence. These two grounds may be treated together. It is true that there is little direct evidence as to when or how young Maupin met his death, but sometimes, as has been pointed out by this court, circumstantial evidence is stronger and more convincing than direct evidence. There is no escape from the conclusion that young Maupin passed along the road leading by appellant's house on December 18 shortly after appellant and his family returned home from Allen's. He was singing as he approached and shots were heard from that direction about the time he would have arrived there, and nothing was ever heard of him thereafter until the body was found buried in a lot on appellant's land and near his home. Thereafter the lot had been plowed and manure scattered on the ground over and immediately surrounding the grave, evidently to

remove traces of the burial. One of the most damaging bits of evidence against appellant was that of Sam Maupin, father of deceased, that after the posse had searched the premises the day before the body was found and had left, he saw appellant and others go to the spot where the body was found, remain there a few minutes looking around and then go away. This indicated that they were trying to ascertain whether the posse had discovered the place of burial. This was all vigorously denied by appellant and Pearl Sams who the witnesses testified was with him; however, and notwithstanding the evidence concerning the good character and reputation of appellant, the jury evidently accepted the statements of Sam Maupin in preference to those of appellant and his witnesses. Under well known and recognized rules, the credibility of the witnesses and the weight to be given their evidence are matters exclusively within the province of the jury. And when, as in this instance as shown by our recitation of the facts, there is competent and substantial evidence tending to show guilt, the case should be submitted to the jury. Where the evidence is conflicting and the character of the verdict necessarily depends upon whether the evidence for the commonwalth or that for the defendant is to be believed, the appellate court under proven facts and circumstances as revealed here would not be authorized to say the verdict is flagrantly against the evidence. Cavanaugh v. Commonwealth, 172 Ky. 799, 805, 190 S. W. 123.

Some question is made concerning the instructions given by the court but less than a dozen lines of the brief are devoted to that question and no error in the instructions is pointed out nor is there any citation of authority to sustain the contention. We have examined the instructions and conclude that on the whole they properly and fairly submitted every issue made by the evidence.

Finding no error prejudicial to appellant's substantial rights the judgment is affirmed.